CAPITAL LEASING OF OHIO,
INC, Plaintiff,

v.

COLUMBUS MUNICIPAL AIRPORT
AUTHORITY, Defendant.

No. C2–98–356.

United States District Court,
S.D. Ohio,
Eastern Division.

July 15, 1998.

Laurence Edward Sturtz, Carlile, Patchen & Murphy, Columbus, OH, for Plaintiff.

John Ryan Gall, Squire Sanders & Dempsey, Columbus, OH, for Defendant.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

### I. *Procedural History*

This case originated in the Common Pleas Court of Franklin County, Ohio on March 18, 1998, when plaintiff filed a complaint and a motion for a temporary restraining order and preliminary injunction. On March 18, 1998, a judge of the state court denied plaintiffs motion for a temporary restraining order. On March 31, 1998, plaintiff filed an amended complaint for a temporary restraining order and injunction and for a declaratory judgment. On April 3, 1998, defendant filed an answer to plaintiffs amended complaint and a notice of removal of this action to this Court based on federal question jurisdiction. On April 20, 1998, plaintiff filed in this Court a new motion for preliminary injunction. On April 23, 24, and 28, 1998, this Court held an evidentiary hearing on plaintiff's motion for preliminary injunction, which hearing, by agreement of the parties, was consolidated with the trial on the merits under Fed. R.Civ.P. 65(a)(2).

Subsequent to the hearing, post-hearing briefs were filed by plaintiff and defendant on May 13, 1998 and May 14, 1998, respectively, and on May 18, 1998, reply briefs were filed by the parties. In a conference with counsel on June 25, 1998, the Court requested that certain documents missing from the record be submitted as a part of the record and that the parties submit supplemental briefs regarding the applicability of *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). The parties were in agreement that this be done, and on June 30, 1998, the additional documents and briefs were filed. The defendant further agreed that the present concession agreement with plaintiff and other car rental companies would be extended to August 1, 1998 in order for the Court to render its decision in this case. The Court, having considered the record and the arguments of the parties, now renders this decision on the merits of the issues raised by plaintiff's amended complaint and its motion for an injunction.

## II. *Factual Background*

The facts which form the background for the issues raised in this action are essentially not in dispute. The following narration is based partially on a stipulation of facts agreed to by the parties.

Defendant, Columbus Municipal Airport Authority (Port Authority), is a governmental entity created in 1990 by the City of Columbus, pursuant to the laws of Ohio,[1] to manage the operations of the Port Columbus International Airport.[2]

Plaintiff, Capital Leasing of Ohio, Inc., d.b.a Budget Rent–A–Car of Columbus (Budget), a licensee of Budget Rent A Car Corporation,[3] is engaged in the business of renting motor vehicles at various locations in the City of Columbus. It is one of a number of car rental companies that do business either inside the Columbus airport terminal or near the airport terminal. Those companies that are engaged in the business of renting automobiles to travelers using the airport facilities are divided into two general categories, "on-airport" operators and "off-airport" operators.

On-airport operators, including Budget, are car rental companies that have entered into agreements with the Port Authority whereby they obtain space inside the airport terminal for the location of counters and large signs to attract air travelers who desire to rent vehicles before leaving the terminal. In many cases, a reservation for the rental may have been made in advance by the customer or by a travel agent calling a telephone number for a local Budget office or a toll-free number for a national reservation office servicing various Budget Rent A Car locations throughout the United States.

Because the Columbus airport has had no garage for the storage of rental vehicles, it has been necessary for the on-airport operators to store and maintain their vehicles at office locations near the terminal. Customers in the terminal who enter into rental agreements at the terminal counters are then transported by the car rental companies in their shuttle buses to their other facilities in order to obtain the vehicle the customer has rented. Customers can also proceed by shuttle buses directly to the other facility, enter into rental agreements at that office location and obtain their rental vehicles. Although some car rental companies have leased space from the Port Authority for the location of their storage, maintenance and office facilities entirely on airport property, Budget has not done so. For this purpose, Budget primarily uses its office located on private property leased by Budget at 1441 Stelzer Road, Columbus, Ohio, which is adjacent to the airport's property and is a short distance from the terminal. Budget does, however, lease adjoining property from the Port Authority solely for the storage and maintenance of its vehicles. At its Stelzer Road office, Budget rents cars to both travelers who have arrived at the airport and also to non-airport related or "local" customers.

On-airport rental car companies, like other companies engaged in different business inside the terminal, are referred to as concessionaires and have entered into concession agreements with the Port Authority. The car rental concession agreement, whereby a car rental company obtains counter and sign space inside the airport terminal, requires the company to pay for this space a "privilege fee," an amount based upon the concessionaire's gross revenues. The terms and conditions of the concession agreements are

---

1. Ohio Rev.Code § 4582.21 *et seq.*

2. Prior to 1991, the City of Columbus, owner of the airport property, operated the airport through its Department of Public Utilities and Aviation, Division of Airports. In 1991, the City, pursuant to an Airport Operation and Use Agreement, transferred to the Port Authority the exclusive right and authority to occupy, operate, control, and use the Airport and authorized the Port Authority to possess all of the powers and authority provided or available to a port authority under the provision of Chapter 4582 of the Ohio

Revised Code, with certain enumerated exceptions. (Port Authority's exhibit 26.)

3. Kevin Miles, General Manager of Budget, in referring to Budget stated "We're a franchisee in Columbus, Ohio." (Tr. Vol. II p. 35.) It appears from Budget's invoice that Budget is "An Independent Budget System Licensee" (Budget's exhibit Q.), presumably a licensee of Budget Rent A Car Corporation. (Affidavit of Robert L. Aprati, General Counsel for Budget Rent A Car Corporation, and Budget's exhibit P.)

set forth in detail and, until recently, have been for a term of five years. Budget entered into such an agreement in 1987 and in 1993. The current agreement expired April 15, 1998, but, by agreement of the parties, has been extended until August 1, 1998.

Off-airport car rental companies are companies that have no agreements with the Port Authority and have no counter space inside the terminal. They have access, however, to the Port Authority's property for the purpose of transporting customers with their shuttle buses between their off-airport offices and the airport terminal. They are permitted to obtain access to the Port Authority's facilities by the payment of an "access fee" which, together with other detailed terms and conditions, is fixed by regulations adopted by the Port Authority's board.[4]

Some car rental companies in recent years have engaged in the practice of passing on to their customers the charges imposed on the car rental companies for doing business at airport facilities by carving out or "unbundling" this overhead cost and adding it to the amounts charged on their invoice to the customer for time and mileage, together with charges for other services the customer may desire to purchase, such as insurance, cellular telephones, childrens' seats, and taxes imposed by governmental entities. For example, since December, 1997, Hertz System, Inc. (Hertz), an on-airport operator, adds this charge as "Apt Conc Fee 10%" (meaning Airport Concession Fee) on its invoice to its Columbus airport customers. (Budget's exhibit O.) The invoice is placed in an envelope (Budget's exhibit N) which contains the "Rental Agreement Terms and Conditions" applicable to "the Hertz Corporation or the independent Hertz System, Inc. licensee identified on the Rental Record." (the Columbus Hertz Rent–A–Car Company is identified on the invoice as a "Hertz System Licensee.") Paragraph 7 of the rental terms and conditions on the envelope concerns "Computation of Charges," and section 7(e) recites that: "Sales/use/excise taxes, tax reimbursement and airport related fees are charged as and where required or permitted by applicable law." [5]

Budget also has engaged in this practice. In September, 1997, Budget added this expense to the customer's invoice as an "airport fee." (*See, e.g.,* Budget invoice and rental agreement CMH 18741, October 11, 1997 describing the charge as "10% AP Fee," attached to the stipulations of facts, and Port Authority's Exhibit 15, p. 1, describing the charge as "10% Airport Fee.") [6] When this practice came to the attention of Susan Warner–Dooley, general counsel and director of properties and administration of the Port Authority, she sent a letter on October 9, 1997, notifying the car rental concessionaires that the Port Authority did not consent to the use of the terms "airport fee" as part of

4. Thrifty Rent–A–Car System, Inc. (Thrifty) is an off-airport car rental company with a location on Stelzer Road. The owner testified that initially off-airport car rental companies were not charged any fee for doing business on airport property, were later charged a fee based upon the number of shuttle bus trips, and are currently charged a fee based on gross revenue from their airport business. The current access fee is 8% of the gross revenue only from its airport customers. (Tr. Vol. II pp. 104–106, 118, and Port Authority's exhibit 17.) Thrifty passes on this cost to its customers as an "access fee" on its invoices. (Tr. Vol. II pp. 119–20.)

5. Hertz does not pass this cost on to all of its customers. Under certain contracts with large volume customers, *e.g.,* IBM, the airport concession fee is not charged. (Tr. Vol. III pp. 17–19.)

Hertz initiated the practice of unbundling its airport concession fee and imposing it on its customers some years ago at the direction of its national licensor, because off-airport companies were doing this and advertising a lower rate. It was discontinued after a very short time because, according to the Hertz witness, "I think it was a combination of one of the competitors that they were trying to compete with changing their policy as well as some negative customer reaction." Hertz, the local licensee, resumed the practice on its own initiative in December 1997. (Tr. Vol. III pp. 24–27.) It did not, however, result in a reduction of the rates charged airport customers but was added income to Hertz which, according to Hertz, enabled it to participate in some of the nationally advertised rates for Hertz rental cars. (*Id.* at 34–36.)

6. Prior to September 1997, this concession fee cost was "built into the rate." (Tr. Vol. II p. 20.) According to Budget, it decided to pass this cost on to the customer as a surcharge because the Port Authority was going to increase the cost by including other items, in addition to just time and mileage, as gross revenues on which the concession fee is based. (*Id.* at 21–23.)

any separate statement of the charge on their customers' car rental contracts. (Joint Exhibit 13.) Ms. Warner–Dooley was subsequently contacted by Kevin Miles, General Manager of Budget, who asked whether Budget could use the words "access fee" to describe the separately stated charge. Ms. Warner–Dooley testified that she informed Mr. Miles that "access fee" was not prohibited by her October 9, 1997 letter.[7] (Tr. Vol. III pp. 75–83.)

Since that time, Budget has described this charge on its invoice as "10% Access Fee." (See, e.g., Budget invoice and rental agreements in October, November, and December 1997, attached to stipulation of facts, and Port Authority's exhibit 15, pp. 2–5.) Budget, unlike Hertz, prints the terms and conditions of the rental agreement on the back of the invoice form and not in a separate envelope. There is no reference to or description of this added "access fee" in the terms and conditions printed on the back of the invoice form.[8] The "10% Access Fee" appears on Budget's list of charges below its total time and mileage charge—appearing sometimes in the space entitled "Drop Charge"—and just before the "Sub Total" and "Tax and/or Surcharge" spaces. When a customer calls the 1–800 number for the national Budget Rent a Car reservation office and informs that office that the location for renting the car is Columbus, Ohio, the customer is told that there will be a 10% "access fee." If the customer asks about this charge, Budget's General Manager assumes that the customer is told it is "an airport fee" (Tr. Vol. II pp. 15–18) or a "concession fee." (Tr. Vol. II pp. 19, 33.) He did not know what travel agents actually

say to customers regarding this surcharge. (Tr. Vol. II p. 81.)

The controversy between Budget and the Port Authority that resulted in this lawsuit arose in the context of major changes being made in the airport's facilities under an expansion and remodeling project and because of the Port Authority's insistence upon significant changes in its concession agreements with on-airport car rental companies.[9] Included in the construction projects underway at the airport is a new garage adjacent to the terminal which will have spaces for the storage of vehicles of the on-airport car rental companies. When this new garage is completed sometime in the year 2000, it will not be necessary for an arriving or departing air traveler to board a shuttle bus and ride from or to the terminal in order to pick-up a rental car or drop-off a rental car at the rental car company's other facility. That facility, however, would still be used to service the rental car company's local customers, e.g., Budget's Stelzer Road facility.

Since approximately August, 1997, the Port Authority, in advance of the expiration of the current concession agreements in April, 1998, has discussed proposed terms and conditions of a new agreement with car rental companies interested in operating in the terminal as on-airport concessionaires. The proposed agreement included terms, conditions and fees which would be charged for the use of spaces in the new garage when completed. All car rental concessionaires would rent this garage space, and the other facilities previously used for storage and maintenance of vehicles and renting cars to airport travelers would be used only for maintenance and repair, to store vehicles not in use, and to serve local traffic.[10] The pro-

---

7. Ms. Warner–Dooley testified that she informed Mr. Miles that "access fee" was not prohibited; she also testified, however, that she did not *authorize* use of the terms. (Tr. Vol. III pp. 80–81.) Mr. Miles, on the other hand, testified that Ms. Warner–Dooley told him to call the charge "access fee." (Tr. Vol. II pp. 19, 36–39.)

8. By agreement of the parties, a complete copy of Budget's invoice and terms and conditions as of April, 1998, was submitted post-bearing as Budget's exhibit Q.

9. There is a lawsuit pending in the Court of Common Pleas of Franklin County, Ohio, num-

ber 97CVH04–4335 in which the Port Authority has brought an action against Budget, contending that Budget has not paid its concession fees under its 1987 and 1993 concession agreements. The parties agreed that the federal court is not being asked to resolve any of the issues that are pending in the state court action. (Tr. Vol. I pp. 4–5.)

10. When the new garage is completed, on-airport concessionaires will complete the rental transaction inside the airport facilities and there no longer will be shuttle buses operated by those companies between the terminal and other locations. (Tr. Vol. I p. 8 .)

posed agreement also included provisions which are at the heart of the present controversy.

As originally drafted by the Port Authority, section 4.6 of the agreement prohibited the car rental companies from "unbundling" the amounts paid to the Port Authority and passing this expense on to the customers as a separate charge. (Joint exhibit 3, § 4.6.1.) [11] According to Ms. Warner–Dooley, who drafted the agreement for the Port Authority, there were protests by the car rental companies when this was disclosed in the Port Authority's invitation to bid for rental car concessions at the airport.[12] This initial invitation to bid was published January 21, 1998 and required that all bidders sign and return the proposed agreement with their bids. (Joint exhibit 3.) As a result of complaints by Budget and other car rental companies, the Port Authority agreed to three addenda to the proposed agreement.

11. Section 4.6.1 of the proposed agreement originally read as follows:

> Concessionaire acknowledges that the payments by Concessionaire to the Authority under this Agreement are for Concessionaire's use of facilities at the Airport, and that none of those payments reflects a fee that is imposed by the Authority upon customers renting cars from Concessionaire. Nothing in this Agreement shall be deemed to permit Concessionaire to charge its customers a separate amount to allow Concessionaire to recover the Privilege Fee, Space Rent or any portion thereof directly from the customer.

(Joint exhibit 3.) (The parties stipulated that fourteen (14) documents identified as "Stipulated Documents" could be admitted into evidence, subject to any objections as to relevance. No objections as to relevance were made, and the parties have referred to these documents as "joint exhibits," and they will be referred to by the Court in the same manner.)

12. Ms. Warner–Dooley testified that she investigated what other airport authorities were doing with regard to the practice of rental car companies charging their customers a separate amount for the concession fee required by the airport authorities. She considered a report and recommendations of the National Association of Attorneys General Task Force on Car Rental Industry Advertising and Practices (Port Authority's exhibit 18; Tr. Vol. III pp. 64–69) and various articles dealing with practices of rental car companies. (Port Authority's exhibits 19–24; Tr. Vol. III pp. 69–73.) These documents are admitted in evidence solely for the purpose of establishing the fact that Ms. Warner–Dooley conducted an investigation before drafting the prohibition in section

Addendum Number 1, dated February 9, 1998, deals with the garage under construction and the garage space rent required to be paid to the Port Authority. Some car rental companies, because of this added cost of doing business as on-airport operators, had urged that the Port Authority impose this charge as a Customer Facility Charge directly on car rental customers (Tr. Vol. III p. 117), similar to the $3.00 passenger facility charge directly imposed by the Port Authority on travelers purchasing an airline ticket. The Port Authority refused to impose such a charge, but, as a compromise measure, Addendum Number 1 authorized the car rental companies to "unbundle" this expense and add it as a separate charge to their customers as a "garage recoupment surcharge." [13] The terms and conditions under which this charge could be made, including its location on the invoice, are spelled out in the Addendum.[14]

4.6.1 against charging this fee to customers. They are not admitted for the purpose of establishing the truth of the content of the documents in question.

13. According to Ms. Warner–Dooley, the operators also desired to have the Port Authority require them to impose this charge directly on their customers because of a concern over potential antitrust liability. An opinion letter from an antitrust attorney, provided by the car rental companies, indicated that there would be no violation so long as the charge was authorized by the Port Authority, although not required or even expressly approved by the Port Authority. (Tr. Vol. III pp. 209–210.)

14. Addendum No. 1 reads, in part, as follows:

> Paragraph 4.6.1 Add the following first sentence: "Concessionaire understands that the Authority does not support the practice of transferring Concessionaire's obligation for payment of the Privilege Fee due herein to its [ ] customers. However, Authority understands the Space Rent will be a substantial increase over the prior rent for the concessionaires' service facility. Therefore, the Authority does not require but will not prohibit the separate statement of a Garage Recoupment Surcharge on the terms and conditions specified herein."
> New Paragraph 4.6.2 Add new paragraph 4.6.2 to read: Garage Recoupment Surcharge Concessionaire is permitted (but not required) to collect a Garage Recoupment Surcharge only under the following conditions:
> 1. Such .surcharge is titled "Garage Recoupment Surcharge";

The Port Authority has interpreted its current concession agreement as imposing a charge on the on-airport car rental companies computed on the basis of a percentage of their gross revenues at both their counters inside the terminal and at the facilities where they store and maintain their vehicles, referred to in the proposed agreement as "designated service facilities." (Tr. Vol. III p. 60.)[15] The new agreement would specifically describe this method of calculating the "privilege fee,"[16] although the percentage would now be applied to include income not previously included, *e.g.,* insurance charges, cellular phone charges, *etc.* The percentage, however, is reduced from 10% to 9.25%.[17] Both Budget and Thrifty,[18] car rental companies whose service facilities are not on airport-owned property but on private property located on Stelzer Road in close proximity to the airport, protested against the inclusion of rental income from these locations that is "local income," *i.e.,* car rentals to customers for local, non-airport related use. (Tr. Vol. II p. 84–85.) Both Budget and Thrifty informed the Port Authority that 40% of the business conducted at their Stelzer Road locations is with local customers. In response, the Port Authority did not change its method of calculating gross income in the proposed contract, but it did, by Addendum Number 2, effectively reduce this percentage fee on the local income from 9.25% to 4.625% by excluding 50% of the gross revenues from local customers.

Addendum Number 2 paragraph 4.2.3.1 (exclusions from Gross Revenue) reads, in part, as follows:

Add new sub-paragraph 4.2.3.1 to read: "Local Traffic

Fifty percent (50%) of the Gross Revenue from each of Concessionaire's transactions with a Local Customer occurring at Concessionaire's Designated Service Facility. For purposes of this Agreement, a Local Customer is a customer residing within the Columbus Metropolitan Statistical Area (MSA) as documented by a driver's license showing an address within the Columbus MSA."

(Joint exhibit 5.)

Finally, Addendum Number 3 reflects a retreat by the Port Authority from its initial desire to prohibit the "unbundling" of the privilege fee and assessing it on the car rental customer as a separate charge. Addendum Number 3 recognizes that such a practice may occur and that, if it does, such a charge must appear adjacent to the time and mileage charges and a number of specific words may not be used to describe this

2. There is no reference to the Airport or the Authority and there is no statement or inference in writing or orally that the fee is imposed by the Airport or the Authority;
3. Such Surcharge shall be immediately adjacent to Concessionaire's time and mileage charge on the customer's invoice;
4. If the Concessionaire elects to charge a Garage Recoupment Surcharge, Concessionaire complies with FTC requirements with respect to this charge and notifies the customer of the surcharge at the time of reservation and again at the time of execution of the contract;
5. The amount of the surcharge per rental car transaction does not exceed the applicable Annual Garage Recoupment as described [in section 4.6.3].
(Joint exhibit 4.)

15. The Port Authority's position that Budget has violated its current agreement by not including all of its income from the Stelzer Road office is the subject of the lawsuit brought by the Port Authority against Budget in state court. ·(*Supra,* footnote 9.)

16. Section 4.2.1 of the proposed agreement defines Gross Revenues as follows:

Gross Revenue means the total amount charged by Concessionaire during an Agreement Year, including any separately stated fees, surcharges and other charges, in connection with: (i.) Concessionaire's Rental Car Business under this Agreement; (ii.) any activities related directly or indirectly to that· business; and (iii.) any other business of Concessionaire in the Operating Areas, in Concessionaire's Designated Service Facility, or elsewhere at the Airport.
(Joint exhibit 8.)

17. Each on-airport car rental company must also agree to pay a minimum annual guarantee. The company pays the Port Authority the greater of the minimum annual guarantee or the 9.25% privilege fee.

18. In previous years, Thrifty has been an off-airport operator; Thrifty plans to go on-airport under the proposed agreement. (Tr. Vol. II pp. 118–19.)

charge. Addendum Number 3 reads, in part, as follows:

Paragraph 4.6.1 Delete Section 4.6.1. Add new Section 4.6.1 to read: "Concessionaire acknowledges that the payments by Concessionaire to the Authority under this Agreement are for Concessionaire's use of facilities at the Airport, and that none of those payments reflects a fee that is imposed by the Authority upon customers renting cars from Concessionaire. Concessionaire understands that the Authority does not support the practice of transferring Concessionaire's obligation for payment of the Privilege Fee due herein to its customers. Concessionaire is prohibited from using the following words, or any form thereof: Airport, Authority, Government, Port Columbus, Concession, Access, Passage, Cost of Doing Business, Fee, Toll, Assessment, or Tax in describing any surcharge the Concessionaire may impose on customers. Any charges made by Concessionaire on its customers in an attempt to recover its costs in operating under this Concession Agreement must appear adjacent to time and mileage charges. Concessionaire is prohibited from stating or implying, in writing or verbally, that the Airport or Authority imposes or approves of any such direct charge to a customer. The Authority understands the Garage Space Rent will be a substantial increase over the prior rent for the concessionaires' service facilities. Therefore, the Authority authorizes, but does not require, the separate statement of a Garage Recoupment Surcharge on the terms and conditions specified herein."

(Joint exhibit 6.)

### III. *Issues*

 Budget contends that any charge imposed by the Port Authority on revenues at its Stelzer Road location from car rentals to local, non-airport travelers (1) is a tax and beyond the Port Authority's ability to impose, and (2) is a charge not imposed on other businesses that operate in the terminal under concession agreements and hence violates the Equal Protection clauses of the United States and Ohio Constitutions. Budget also contends that the restrictions on its speech in describing the privilege fee to its customers on its invoices is a violation of Budget's right to freedom of speech under the First Amendment to the United States Constitution.[19] Budget seeks an injunction against the Port Authority to prevent the enforcement of the challenged provisions.[20]

### IV. *Discussion*

A. *Budget's Claim that the Privilege Fee Cannot Be Imposed on Revenue From Local Traffic*

As noted earlier, Budget's office on Stelzer Road, adjacent to the airport property, rents

---

19. Budget also initially challenged a provision of the proposed agreement dealing with the intentional diversion of airport related customers (Joint exhibit 8, § 4.5 *No Diversion*), but this dispute was resolved by the parties prior to the hearing.

20. Prior to the hearing, the Court raised the question of its ability to enjoin the collection of the charge on local car rentals if, as Budget contends, it is in reality a tax, in light of the Tax injunction Act, 28 U.S.C. § 1341. Budget agreed to limit the relief sought regarding this issue to a declaratory judgment. (Tr. Vol. I pp. 3–4.)

However, the Court notes that, should it find that the privilege fee is a tax, there would still be the question of the Court's ability to provide the declaratory relief sought by Budget. The Tax Injunction Act "applies to declaratory as well as injunctive relief." *Franchise Tax Bd. of California v. Alcan Aluminium Ltd.*, 493 U.S. 331, 338, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990); *California v. Grace Brethren Church*, 457 U.S. 393, 408, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943).

vehicles to travelers using the airport facilities and also to local customers who have no connection with the airport. The proposed concession agreement requires that a car rental company doing business as an on-airport operator designate a facility for car maintenance and storage for all cars used as part of its airport rental car concession, the facility to be known as the concessionaires's Designated Service Facility. (Joint exhibit 8, § 2.2.) It is undisputed that Budget would be required to designate its Stelzer Road location as its Designated Service Facility. The agreement requires that "All Gross Revenues generated at a Designated Service Facility shall constitute Gross Revenues covered by this Agreement." (*Id.*) The agreement defines "Concessionaire's Rental Car Business" as including "the rental or short-term leasing of cars and related transactions at the Airport (including Concessionaire's Designated Service Facility) ..." (*Id.* at § 4.2.2) and makes it clear that income from the Designated Service Facility must be included as gross revenue on which the 9.25% privilege fee is calculated. Section 4.2.1 defines gross revenue as follows:

> Gross Revenue means the total amount charged by Concessionaire during an Agreement Year, including any separately stated fees, surcharges and other charges, in connection with: (i.) Concessionaire's Rental Car Business under this Agreement; (ii.) any activities related directly or indirectly to that business; and (iii.) any other business of Concessionaire in the Operating Areas, in Concessionaire's Designated Service Facility, or elsewhere at the Airport.

(Joint exhibit 8.)

It is therefore clear that Budget would be required to pay the Port Authority's privilege fee not only on its income from airport-related car rentals but also on its income from non-airport related or local car rentals at its Stelzer Road location. As a result of complaints by Budget and Thrifty, Addendum Number 2 included an exclusion to gross revenues for 50% of the gross revenues on local customers. According to Ms. Warner–Dooley, the exclusion of 50% of the gross

revenues due to local car rentals "was our compromise to try to assist the Budget, the Thrifty, that were having difficulties with the combined increased costs with parking garage space rent as well. It was also a recognition that [Budget and Thrifty] do local advertising." (Tr. Vol. III p. 142.) The Port Authority did not exclude such local revenues entirely from the privilege fee because, as Ms. Warner–Dooley explained:

A. We look at, we need those revenues in order to—yes, pay our operating expenses for current capital improvements, future capital improvements. That's what these moneys are going to, and we look at that factor, and that was one of the balancing factors in looking at a 50 percent exclusion for local traffic. That's one reason, even though we decided to do a compromise, we didn't exclude all local traffic. We need those revenues from 50 percent of the local traffic to help pay our various costs.

Q. And you need the revenues from the 50 percent of the local traffic whether that local traffic has any burden or any impact on your airport, isn't that correct?

A. That is a price that is paid, yes, as part of the concession.

Q. Isn't it correct that you charge the 50 percent income on the local traffic whether or not there is any burden on the airport?

A. That is correct.

Q. You're charging that because you, as the administrator, saying that if you want to come on this airport, that's the fee I'm going to assess you rental car companies; is that correct?

A. That is correct and because of the benefit you get as a concessionaire, the exposure to all the local traffic that's going through our terminal.[21]

(Tr. Vol. III pp. 138–39.)

### 1. The Tax Argument

██ There is no question regarding the power of the Port Authority to impose

---

**21.** According to Ms. Warner–Dooley, the car

rental concessionaires, among all the conces-

charges for the use of its facilities. Ohio Rev.Code § 4582.31 includes among enumerated powers granted a port authority the power to "charge, alter, and collect rentals and other charges for the use or services of any port authority facility as provided in section 4582.43 of the Revised Code." Section 4582.43 of the Ohio Revised Code, in turn, provides that:

A port authority may charge, alter and collect rentals or other charges for the use or services of any port authority facility and contract in the manner provided by this section with one or more persons, one or more governmental agencies, or any combination thereof, desiring the use or services of the facility, and fix the terms, conditions, rentals, or other charges for such use or services.

It is also clear that income generated from such rentals or other charges must be used only for expenses of the port authority. Section 4582.39 specifies that "rents and charges received by the Port Authority shall be used for the general expenses of the Port Authority and to pay interest amortization, and retirement charges on money borrowed."

■ It is Budget's position that the charge imposed on local car rentals, although described as a privilege fee, is in actuality a tax and beyond the power of the Port Authority to impose, because it is imposed on transactions that are purely local in nature and create no burden on or cost to the Port Authority. To support its position, Budget relies on Ohio law to the effect that a charge imposed by a governmental entity that bears no relationship to the burden on or cost to the governmental entity is a tax. The cases cited by Budget, however, are distinguishable.

In *Ass'ns, Conventions, Trade ·Show, Inc. v. Ohio Expositions Comm'n,* 1989 WL 52940 (Ohio App. May 18, 1989) (*ACT I*), the Ohio Expositions Commission required a decorating company to sign an agreement to pay the Commission a percentage of its gross receipts in order to obtain access to the Exposition Center for the purpose of doing busi-

ness with an exhibitor who had rented space in the building. Other companies that provided goods and services to the exhibitors were not required to pay this charge. The Ohio appellate court held that the Commission was a state agency operating the building "for the benefit of the citizens of the entire state and not for a local municipal corporation" (*Id.* at *5) and thus was acting in a governmental capacity rather than a proprietary capacity. It also held that the required agreement did not involve any property right or right to possession of the premises, but only the right to come into the building to do business, and as such was a permit or license. Because the amount charged greatly exceeded the costs incurred by the governmental entity, it was deemed to be a tax rather than a license fee. The Court also found that there was no rational basis for imposing this charge on decorators and not imposing it on other similarly situated vendors and hence was a denial of equal protection under the Fourteenth Amendment to the United States Constitution. *Ass'ns. Conventions, Trade Shows, Inc. v. Bd. of Franklin County Comm'rs,* 1991 WL 160044 (Ohio App. Aug. 15, 1991) (*ACT II*), dealt with the same issue with respect to the Veterans Memorial building. The same appellate court found that in that case a genuine issue of material fact existed regarding whether the amounts charged by the Board constituted a tax.

In contrast to the *ACT I* and *ACT II* cases, the charge imposed on Budget is a charge for occupying space inside the airport terminal for a counter and large signs and the associated benefits of being an on-airport operator. Although, as previously noted, the name given this charge is a "privilege fee," it is similar, if not identical to a space rental charge. It is not simply a permit or license fee to enter the airport property, it is a charge made for the benefits of occupying the Port Authority's property and doing business at that location. The proposed contract sets forth in great detail the rights and responsibilities of both the tenant and the land-

---

sions in the airport terminal, produce the highest revenue for the Port Authority. "We are looking to get money in exchange for the benefits" (Tr.

Vol. III p. 52) and "we have the duty to get fair market value from our leases. That would include our concession agreements." (*Id.* at 132.)

lord, so to speak, and cannot in any way be considered merely a regulatory license.

Apart from Ohio law, Budget argues that "other states which have considered the same issue as is present here have reached a similar conclusion." (Budget's post-hearing brief, p. 19), *citing, City of Kenner v. New Orleans Aviation Bd.*, 603 So.2d 220 (La. App.1992) (*Kenner*). In *Kenner*, a state statute dealing specifically with charges imposed on "nontenant, auto rental users of each airport in this state," imposed certain restrictions on those charges, including a requirement that they "must be based on the cost to the airport of the particular facilities or services used by such nontenant, auto rental user." A New Orleans ordinance authorized the New Orleans Aviation Board to impose charges on the nontenant auto rental companies based upon a percentage of their gross business receipts. The Louisiana Court of Appeals found that the ordinance and a required Permit Agreement conflicted with the state statute in a number of respects, including the above quoted requirement. The Court found it "unnecessary to address whether or not the fee is an illegal tax." *Id.* at 227. *Kenner* clearly has little or no application to the facts of the present case. It was based on a conflict between a state statute and a local ordinance dealing only with off-airport rental car companies and did not involve, as does this case, charges made by an airport authority for a concession inside the airport terminal. Like the statute, the ordinance dealt only with car rental companies "who do not have leases or concession contracts with the Board." *Id.* at 224.

In the present case, the Port Authority clearly has the authority to impose "rentals or other charges ... for the use or services of any port authority facility" (Ohio Rev.Code § 4582.43), and no statutory restrictions are imposed on the amount of those charges or the method of calculating those charges. The Port Authority has determined that the amount of the concession fee will be 9.25% of the gross income of the rental car company occupying space inside the terminal and that the method of calculating the 9.25% will be to include gross income from both the rental car

company's airport counter and its designated service facility. The fact that some part of that gross revenue includes a portion attributed to local car rentals at the designated service facility does not transform what is essentially a charge for rent into an illegal tax. A rental car company must decide whether the space and benefits of being inside the terminal are worth the privilege fee, or rent, fixed by the landlord of the premises, the Port Authority. As Ms. Warner-Dooley testified on cross-examination:

A. It's in no way a tax. It's a privilege fee for under a concession agreement, concession opportunity, that is bid.

Q. And so if you want to come into the airport and have a counter, you could submit yourself to having a fee levied upon you for all the business of the company no matter where you have that business?

A. That is a business decision that bidders make. Thrifty for a long time has stayed off airport because of that.

Q. And you're saying that's correct. That's what Budget has to do. They have to decide if they will pay what you want from all their businesses, whatever you choose to extract, and then make the business decision?

A. They have to decide if they are willing to live with the terms of the concession as proposed and make that business decision.

(Tr. Vol. III pp. 143.)

Budget makes the same argument here as was made in *Budget Rent–A–Car Sys., Inc. v. County of Wayne*, 742 F.Supp. 947 (E.D.Mich.1990), *aff'd*, 951 F.2d 348 (6th Cir. 1991) (*Wayne County*). In that case, Wayne County, Michigan required in its contract with the Budget company that "in consideration for an in-terminal concession at the Detroit Metropolitan Airport, plaintiff must pay 9.5% of its gross revenues derived from all operations within three miles of the airport," *Id.* at 948. The Budget company argued that its local rentals bore no relationship to its airport activities and therefore to include those rentals in its gross revenues

constituted an illegal tax. In rejecting that argument, the district court said:

> Plaintiff's argument is without merit; defendant's system of access fees is not the functional equivalent of a tax. Rather than attempt to decipher the purposes for which every individual who rents a car from every interminal rent-a-car concessionaire, defendant has insisted on the provision in question which applies to all gross revenue a rent-a-car company receives within three miles of the Airport.

*Id.* at 951.

The Port Authority in the present case, unlike *Wayne County*, is not imposing a fee on all of the local income generated at Budget's Designated Service Facility. But whether the fee is on all of the local income or on only one half of that income is of no significance, nor is the Port Authority's motive for the imposition of this fee on local income determinative. The significant and determinative fact is that it is a fee charged by the Port Authority for occupying space and doing business in the terminal. The fact that the computation of that fee is based upon not only income from the airport counter but also from the Designated Service Facility which includes a portion of local rentals, does not transform the concession fee into a tax. As in *Wayne County*, Budget's argument that such a fee constitutes an illegal tax is without merit.

■ Budget attempts to discredit the *Wayne County* precedent by arguing that it involved Michigan law rather than Ohio law. It is a distinction without a difference. The decision did not turn on any question of Michigan law as opposed to Ohio law, nor does Budget point out any variations. It turned instead, on the basic difference between an involuntary tax imposed on some activity for the benefit of the public and a fee imposed for some benefit offered to the payer which the payer is free to pay or not pay. As our Sixth Circuit said in *U.S. v. River Coal Co., Inc.*, 748 F.2d 1103, 1106 (6th Cir. 1984):

the test has been variously stated, but the chief distinction is that a tax is an exaction for public purposes while a fee relates to an individual privilege or benefit to the payer.

■ Budget also denigrates the *Wayne County* decision because "the Sixth Circuit's opinion is unpublished and carries with it the restriction found in Rule 24 of the Sixth Circuit Court of Appeals." (Budget's posthearing brief, p. 19.) Apart from the fact that Budget itself relies on two unpublished state court decisions, *ACT I* and *ACT II*, *supra*, which under Rule 2(G)(1) of the Ohio Supreme Court's Rules for Reporting of Opinions are not considered controlling authorities, under Sixth Circuit Rule 24(c), an unpublished opinion may be cited if the unpublished decision has precedential value in relation to a material issue in a case and if there is no published opinion that would serve as well. There are no other decisions of the Sixth Circuit Court of Appeals, published or unpublished, addressing a similar system of fees assessed by an airport or airport authority, and this Court is bound by the unpublished Sixth Circuit decisions as well as by those that are published.

The first prong of Budget's attack on the privilege fee applicable to revenues from local car rentals as constituting an illegal tax having no merit, the Court turns to the second prong—the argument that imposition of such a charge violates Budget's right to equal protection under the Fourteenth Amendment to the United States Constitution and Article I of the Ohio Constitution.

## 2. The Equal Protection Argument

■ Budget's argument that the Port Authority has violated its right to equal protection under both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I of the Ohio Constitution [22] is based upon its contention that "the Authority cannot give any rational explanation or basis as to why Budget will be required to pay essentially 5%

---

22. Ohio's Equal Protection Clause is co-extensive with the equal protection guarantee in the Fourteenth Amendment to the United States Constitution and is subject to the same analysis. *See,* *Fabrey v. McDonald Village Police Dep't.,* 70 Ohio St.3d 351, 353, 639 N.E.2d 31 (1994); *Sorrell v. Thevenir,* 69 Ohio St.3d 415, 422, 633 N.E.2d 504 (1994).

of its non-airport, local revenues as a fee when other concessionaires at the Airport are not charged a similar fee." (Budget's memorandum in support of motion for preliminary injunction, pp. 19–20.) In its post-hearing brief, Budget is somewhat more specific as to an alleged discriminatory classification:

> In this case, the Authority cannot give any rational explanation or basis as to why Budget will be required to pay essentially 5% of its non-airport, local revenues as a fee when other concessionaires at the Airport, *i.e.*, Enterprise, Payless, UPS, Max & Erma's are not charged a similar fee.

(Budget's post-hearing brief, p. 23.)

One very important and undisputed fact must be recognized at the outset. All car rental companies, like Budget, who desire to have counter space and signs inside the terminal are considered as being in one classification as car rental concessionaires, are treated equally by the Port Authority, and are required to sign the same concession agreement. To the extent the other on-airport car rental concessionaires derive local revenue from their Designated Service Facilities, one half of that revenue would also be included as gross revenue subject to the 9.25% privilege fee. No discrimination among the members of this classification has been alleged or proved.

It appears from Ms. Warner–Dooley's testimony on cross-examination that Anton Air Foods operates a franchise of Max & Erma's (presumably a restaurant), a franchise for Massey's Pizza and a subcontract for Charlie's Steak House in the airport terminal. (Tr. Vol. III p. 145.) The terms and conditions and compensation paid to the Port Authority under any concession agreement with Anton Air Foods are not in the record.

United Parcel Service (UPS) is not a concessionaire doing business inside the terminal. It is a courier service which has access to the terminal property and uses the airport's loading docks. (Tr. Vol. III P. 145.) It is not a party to any concession agreement or contract with the Port Authority, but it pays a $300.00 courier fee [23] that has been fixed by

the Executive Director of the Port Authority under guidelines adopted by him pursuant to authority delegated to him by the Port Authority. (Tr. Vol. III pp. 146–47.) The Executive Director also fixes the fees charged the public for using the airport parking lots and the public parking garage pursuant to that same authority. The Port Authority distinguishes between concessionaires, *i.e.* persons or business entities that desire to occupy space inside the terminal and conduct their business on airport property, from persons or business entities that desire merely to have access to airport property for some purpose. The former are required to enter into a concession agreement; the latter are required to pay a user charge or fee and are subject to rules or regulations adopted by the Port Authority or its designated representative. The Port Authority, according to Ms. Warner–Dooley, is acting in a proprietary capacity in requiring contracts of concessionaires (". . . how we set up the business terms, is not because we are a governmental entity. It is because we have an opportunity that people wish to bid for." Tr. Vol. III p. 144) and in a governmental capacity in its regulation of traffic in and out of the airport, including the traffic of off-airport car rental agencies ("Our governmental authority comes in with the off-site rules." Tr. Vol. III p. 144.)

The reference to Enterprise and Payless is to two car rental companies that apparently occupy somewhat hybrid positions between on-airport car rental concessionaires and off-airport car rental companies. Enterprise has a location on airport property, not inside the terminal but at the Lane Aviation airplane hanger. Payless similarly has a location on airport property, not inside the terminal but at the Concourse Hotel. (Tr. Vol. III pp. 167–68.) The Port Authority does not require these companies to enter into the concession agreement that is required of Budget and other car rental companies having counters inside the terminal, but instead has entered into separate contracts with these companies "that refer to the off-site rules and set parameters for operating."

---

**23.** It is not clear from the record whether this fee is paid on a weekly, monthly, or annual basis.

(Tr. Vol. III p. 167.) [24] These two car rental companies, having "access to the airport hotel customers as well as airport hanger users," pay a higher percentage fee than the 8% access fee off-airport car rental companies are required to pay because of their special positions and their proximity to the terminal. (Tr. Vol. III pp. 167–69, 192.) Although the contracts with these companies are not in evidence, Ms. Warner–Dooley testified that these companies are not required "to pay on their local business," whereas Budget and other car rental companies having counters inside the terminal are required under the concession agreements to pay a percentage of their gross income from local car rentals. (Tr. Vol. III pp. 170–72.)

Although Budget, in its post-hearing brief, does not include off-airport car rental companies in its list of business entities allegedly receiving favored treatment, the Court notes that their operations are governed by "Rules Regarding Off–Site Parking Operators and Off–Site Car Rental Operators." (Port Authority's exhibit 17.) Under those Rules, any car rental company that "uses the Airport by transporting customers to or from the Airport other than pursuant to a contract with the Authority for such services ... must obtain a license to use the airport" and must pay a "User Fee," based upon a percentage of the Operator's gross revenues.[25] (Port Authority's exhibit 17, pp. 2–3.) Gross revenues is defined as all revenues received, derived or accruing to an Operator from its operations conducted at, on, from, or to the airport. (Port Authority's exhibit 17, pp. 1–2.) This is presumed under the Rules to include all transactions occurring in whole or in part at or allocated to locations of the operator within three miles of the airport. This presumption of airport related transactions can be rebutted, however, (and the income excluded from the fee), by providing one of an enumerated list of documents. (Port Authority's exhibit 17, p. 2.) Thus, off-airport car rental companies—unlike on-airport car rental companies—can avoid paying a fee on non-airport related transactions.

While Budget refers to Max & Erma's, UPS, Enterprise, and Payless as being "concessionaires at the Airport," it is clear from the record that only Max & Erma's is considered by the Port Authority as a concessionaire by virtue of conducting its business inside the airport terminal. Although, as previously noted, the concession agreement with Max & Erma's is not in evidence, Ms. Warner–Dooley testified that this business, like Budget, pays "a concession fee, a percentage fee." (Tr. Vol. III p. 137) and that "on-airport concessionaires" in exchange for the benefits and privileges of being inside the terminal agree to pay "a percentage." (Tr. Vol. III p. 165.) With respect to Max & Erma's, that fee is apparently a percentage of the company's gross income from the concessionaire's airport operations. Although Budget's counsel questioned Ms. Warner–Dooley about the ability to include in the concession privilege agreement other Max & Erma's locations off airport property, this was never considered by the Port Authority. (Tr. Vol. III p. 145.) The problem with Budget's comparison of its operations with Max & Erma's, apart from the obvious difference between a restaurant and a car rental operation, is that there is no evidence that the concessionaire that owns and operates the franchise for Max & Erma's restaurant inside the terminal conducts any part of that business outside the terminal, i.e., there is no non-airport related or local income that could be subject to the privilege fee. In fact, the evidence shows that the airport operator of the Max & Erma's restaurant inside the terminal does not have any Max & Erma's franchises off the airport property. (Tr. Vol. III p. 145.)

Unlike the Max & Erma's concession in the terminal, the other businesses which Budget believes are more favorably treated,

---

**24.** The Concourse Hotel and Lane Aviation had entered into agreements with Payless and Enterprise for servicing their customers at their respective locations. Because their land leases required the Port Authority's approval for this activity on airport property, the Port Authority entered into separate agreements with Payless and Enterprise as part of the approval process. (Tr. Vol. III pp. 92–93.)

**25.** From July 1, 1994 to July 1, 1995, the fee was 5%; from July 1, 1995 to July 1, 1996, the fee was 6%; and from July 1, 1997, the fee has been 8%.

*i.e.,* UPS, Enterprise, and Payless do engage in business off the airport property and receive income from non-airport related, *i.e.,* local, transactions, as does Budget at its Stelzer Road location. Budget's complaint is that it must pay a privilege fee that includes 50% of its Stelzer Road local transactions whereas these other business entities pay fees that do not include income from local transactions.[26] While this distinction (particularly with reference to the car rental companies, Enterprise and Payless) may be sufficient to raise an equal protection argument, there is some question of whether any claim of a denial of the constitutional right to equal protection is applicable to the facts of this case, as illustrated by the observation of the district court in *Wayne County:*

> In the case at bar, there is no legislation involved; the government has not specifically classified the car rental companies for different benefits or burdens under the law. The classification is the result of a contract entered into at arms length and mutually agreed to by both parties. It is questionable, then, whether equal protection applies to this case. Defendant maintains that constitutional analysis in a contractual context is inappropriate and inapplicable. Accordingly, defendant moves pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss for lack of subject matter jurisdiction. The Court recognizes, however, that defendant was acting pursuant to state law when it entered into the contract in question, and by this official action, created a classification that results in different benefits and burdens. *See, Columbus Bd. of Educ. v. Penick,* 443 U.S. 449 n. 5, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). Accordingly the Court will test

the classification using an equal protection analysis.

*Budget Rent–A–Car Sys., Inc. v. County of Wayne,* 742 F.Supp. at 949–50.

█ This Court is of the opinion that Budget's constitutional rights are assertable, both as to equal protection and freedom of speech.[27] Although the Port Authority, like any other property owner, is free to insist upon the terms and conditions it imposes upon persons or entities desiring to have access to or use ·its property, it cannot impose conditions that are contrary to the rights granted to all citizens under the United States Constitution. In *U.S. v.· Kokinda,* 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), the Supreme Court said that "[t]he government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business ..." Similarly, in this Court's view, the Port Authority, even when acting in its proprietary capacity, does not enjoy absolute freedom from the constraints imposed by the Equal Protection Clause of the Fourteenth Amendment.

The *Wayne County* court pointed out that the Supreme Court has "provided the following guidance for considering whether an economic regulation violates equal protection guarantees," referring to *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). In that case, the Supreme Court said:

> When a local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. Unless a classification trammels

---

**26.** Budget has made no equal protection claim based on the fact that off-airport car rental companies are permitted to describe the charge made to their customers as an "access fee" whereas on-airport car rental companies would be prohibited under the new concession agreement from using that description to describe the charge made to their customers. Although Ms. Warner–Dooley believes that the use of the term "access fee" by off-airport car rental companies is misleading (Tr. Vol. III p. 113), the Port Authority has not taken any action to prohibit its use by those companies. (*Id.* at 114.) Ms. War-

ner–Dooley was not aware until the week before the bearing that Thrifty was using that term, and Thrifty, presently an off-airport car rental company, is scheduled to become an on-airport car rental company and subject to the restrictions in the new concession agreement. (*Id.* at 109–110.) She is not aware, and there is no evidence, of how Payless and Enterprise describe the charges on their invoices. (*Id.* at 192.)

**27.** Budget's First Amendment right is discussed *infra* at pp. 656–669.

fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.... In short, the judiciary may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines; in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment

*City of New Orleans v. Dukes,* 427 U.S. at 303–04, 96 S.Ct. 2513 (internal citations omitted).

The Port Authority's decision to require on-airport rental car concessionaires to pay a privilege fee on a portion of their non-airport related transactions conducted at their Designated Service Facilities but not requiring other business entities having access to the airport to pay a fee on non-airport related transactions is purely an economic decision, is not arbitrary and has a rational basis related to a legitimate governmental interest. There is a great difference between car rental concessionaires that have a counter space and large signs inside the airport terminal and persons or business entities that do not. The space inside the terminal is limited, and is available to a limited number of businesses that desire to conduct their business inside the terminal. (Tr. Vol. III pp. 161–62.) There is an obvious business advantage of having a car rental business located inside the terminal, not only with respect to customers and potential customers who travel and desire to rent a vehicle, but also with respect to the exposure to local traffic that goes through the terminal. (Tr. Vol. III p.

139.) The Port Authority makes a determination of what the market value is for the concession in setting its fees (Tr. Vol. III p. 138) and solicits bids for concession agreements incorporating those fees.[28]

Courier services, such as UPS, conduct an entirely different type of business, one that does not occupy any terminal space but simply has access to loading docks for the purpose of delivering and picking up packages. Enterprise and Payless also do not occupy any terminal space, but because they have counter locations in closer proximity to the terminal, they are charged a higher fee than off-airport car rental companies. Off-airport car rental companies have the least advantages among the car rental companies and, accordingly, the fee charged by the Port Authority is less than that charged Budget and other car rental companies.

There could be different methods used by the Port Authority in determining the fees charged for use of or access to its property, but, as the Supreme Court has said, the judiciary does not sit as a superlegislature to judge the wisdom of the Port Authority's methods. It is clear to this Court that the fees charged the occupiers or users of the airport property have not been fixed in an arbitrary manner; that there is a rational basis for the different fees charged to the different classifications of occupiers and users of the property; and that there has been no violation of Budget's right to equal protection under the Fourteenth Amendment to the United States Constitution or Article I of the Ohio Constitution.

### B. Budget's Claim that the Restrictions on its Speech Violate the First Amendment

#### 1. The Applicability of the First Amendment and Standard of Review

The parties are at the opposite ends of the spectrum cast by the First Amendment's protection of freedom of speech.

Budget contends that the Port Authority's requirement that it agree to a contract that

---

**28.** The obvious desirability of conducting business inside the terminal and competition for the most favorable location is illustrated by the fact that first choice as to counter space in the new

garage is given to the bidder submitting the highest minimum guaranteed privilege fee. (Joint exhibit 3, p. 10.)

restricts the language that can be used by Budget on its invoices with reference to its privilege fee surcharge is a clear infringement on Budget's constitutional rights under the First Amendment.[29] Its argument appears to be based on two lines of Supreme Court cases. First, Budget contends that a governmental agency's ability to restrict commercial speech is limited and is governed by *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (*Central Hudson*), which sets forth a four-part analysis to be applied in determining whether a restriction on commercial speech meets constitutional muster:

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. 2343. Budget argues that the words used to describe its surcharge—"Access Fee" (Port Authority's exhibit 15)—are not misleading; that this language "accurately describe[s] the fee which they [Budget] have decided to unbundle;" and that there is no governmental interest that can justify prohibiting Budget from us-

ing this language. (Budget's post-hearing brief, pp. 27–28.)

In addition, Budget relies on *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (*Umbehr*), a recent decision of the Supreme Court dealing with the "unconstitutional conditions" doctrine. This doctrine provides that the government " 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit." *Id.* at 674, 116 S.Ct. 2342, *quoting, Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *Umbehr* is the latest in a line of Supreme Court decisions dealing with First Amendment protection in the context of government employees.[30] In *Umbehr*, the Court extended that protection to independent contractors as well as to employees. Budget's argument is that "if a governmental agency cannot regulate the speech of an at-will contractor and use the exercise of the Right to Free Speech as a grounds for terminating the contractual relationship, the mere existence of a written contract does not give the Authority the ability to regulate the speech of Budget and the car rental concessionaires in how they describe the charges which they pass through to the car rental customer." (Budget's post-hearing brief, p. 32.) Stated another way, the argument could be made that the Port Authority cannot condition the receipt of a benefit—a contract for an airport concession—on a curtailment of the First Amendment's right to freedom of speech.

---

**29.** Budget does not challenge another provision of the concession agreement that deals with requirements regarding information concerning fees and charges. Section 3.9.5 "Information Regarding Fees and Charges" provides:

> Concessionaire shall not misrepresent to the public its prices or the terms and provisions of its rental agreements or those of its competitors. Concessionaire shall comply with all applicable rules and regulations of the Federal Trade Commission and all other governmental agencies. Concessionaire shall fully inform each customer, prior to the execution of such customer's rental agreement, of all fees and charges applicable to such customer's rental. If the Authority determines, after notice and

> opportunity for Concessionaire to comment, that any of Concessionaire's business practices are unreasonable, deceptive or unconscionable, Concessionaire shall immediately cease such practices upon receipt of a written order to do so from the Authority. The Authority will give advance notice to Concessionaire that the Authority considers a certain practice to be unlawful or discriminatory and Concessionaire shall have an opportunity to respond to the allegation.

(Joint exhibit 8.)

**30.** See also, *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), decided the same day as *Umbehr*.

The Port Authority's position is at the opposite end of the spectrum. It contends that the First Amendment has no application whatsoever in this case because of a purported right of the Port Authority to condition the grant of airport space on a requirement that Budget limit its speech. According to the Port Authority, "[t]he concessionaires can then make the business decision either to accept the limitation upon their speech or to forego the business opportunity of being an on-site concessionaire. That choice is not a constitutional one." (Port Authority's post-hearing brief, p. 34.) The Port Authority's position is illustrated by the following colloquy with the Port Authority's counsel:

> THE COURT: Well, does Budget have any right under the First Amendment to the United States Constitution to describe its product in a manner that is truthful and not misleading?
>
> \* \* \* \* \* \*
>
> You believe they have no such right? They have no such First Amendment right?
>
> MR. GALL: They have no First Amendment right, there is no First Amendment right implicated by a contract provision such as this which requires them to refrain from making these statements in exchange for or as part of the consideration for something the airport is selling to them. No sir, I don't.
>
> THE COURT: In other words, the Airport Authority has the power to prohibit Max & Erma's from telling its customers that, your hamburger is 100% beef?
>
> \* \* \* \* \* \*
>
> MR. GALL: As a component of the consideration of space at the airport, yes.
>
> THE COURT: They give up that right?
>
> MR. GALL: They can be required to give up that right.

> THE COURT: Is that your position?
>
> MR. GALL: Yes, sir.
>
> THE COURT: In other words, as a component to having space at the airport, they can be required to give up any First Amendment rights they have to commercial speech that is not misleading. Is that your position?
>
> MR. GALL: They can be made to give up the right that your Honor has described, yes.

(Tr. Vol. I pp. 40–42.) In support of this argument, the Port Authority relies on *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (*Rust*), in which the Court upheld regulations that prohibited abortion counseling in family-planning programs funded under Title X of the Public Health Service Act, 84 Stat. 1506, as amended, 42 U.S.C. §§ 300 to 300a–6. The Port Authority points to the following language in *Rust*:

> By accepting Title X funds, a recipient voluntarily consents to any restrictions placed on any matching funds or grant-related income. Potential grant recipients can choose between accepting Title X funds—subject to the Government's conditions that they provide matching funds and forgo abortion counseling and referral in the Title X project—or declining the subsidy and financing their own unsubsidized program. We have never held that the Government violates the First Amendment simply by offering that choice.[31]

*Id.* at 199, fn. 5, 111 S.Ct. 1759. The Port Authority argues that the same reasoning applies to the present case by analogy, *i.e.*, Budget can choose between accepting the contract with the language restrictions or declining to seek such a contract.[32]

The Port Authority's second basic contention, "even if the First Amendment were implicated" (Port Authority's post-hearing

---

**31.** In its supplemental post-hearing brief, the Port Authority also relies on *Nat'l Endowment for the Arts v. Finley*, —— U.S. ——, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), a June 25, 1998 decision of the Supreme Court which followed *Rust* in the same context of governmental restrictions of First Amendment rights in a government-subsidized program.

**32.** The Port Authority also refers to cases involving a governmental entity acting as a "market-participant" under the Commerce Clause, U.S.C.A. Art. 1, § 8, cl. 3 as well as cases involving the Fourth Amendment, none of which appears to the Court to substantially buttress the Port Authority's argument regarding the First Amendment.

brief, p. 38), is that the Port Authority has not violated Budget's First Amendment rights, because it has the right to prohibit actually or inherently misleading speech entirely and to require that potentially misleading speech be presented in a non-misleading manner. *Peel v. Attorney Registration and Disciplinary Comm'n,* 496 U.S. 91, 111, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990) (Marshall, J., concurring) (*Peel*). It contends that Section 4.6.1 of the proposed concession agreement is a constitutional effort to prohibit Budget's use of the term "Access Fee" because it is actually or inherently misleading or, at a minimum, potentially misleading. (Port Authority's post-bearing brief, pp. 42, 46.)

■ In the Court's view, the present case does not fall neatly into any of the categories of cases relied upon by the parties to support their respective positions. This is not a case involving a government subsidy program in which the government has the right to insist "that public funds be spent for the purposes for which they were authorized," *Rust,* 500 U.S. at 196, 111 S.Ct. 1759, and, consequently, there is no First Amendment right to speech that is contrary to the purpose of that subsidized program. This Court does not believe that the Port Authority's position that it has the unfettered right to require Budget to give up its First Amendment rights to obtain space in the terminal on a "take it or leave it" basis is supported by *Rust* or by any other authority.

■ Also, this is not a case in which a governmental unit is exercising its power to regulate or license, as in *Central Hudson* and *Peel;* nor is it a case involving a governmental unit's relationship with its employees or independent contractors as in *Umbehr.*[33] Budget's position *vis-a-vis* the Port Authority is not akin to an employee or independent contractor performing some function on behalf of the governmental unit; it is that of a

company seeking to rent space inside the airport terminal for the location of its car rental counter in order to do business with travelers using the terminal facilities. In the view of this Court, the facts of this case come within the ambit of the decisions of the Supreme Court dealing with the right of a governmental unit, the Port Authority in this case, as a proprietor, to manage its own property and its internal operations and the restrictions imposed on that management by the First Amendment. In *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Court set forth different standards to be applied with respect to government property and the exercise of free speech on that property. In a traditional public forum or a designated public forum, the government, in order to enforce a content-based exclusion on speech, must show that its restriction is necessary to serve a compelling state interest and that it is narrowly drawn to that end, *Id.* at 45–46, 103 S.Ct. 948, but with respect to other government property, the standard is not that high.

Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Id.* at 131, n. 7, 101 S.Ct. 2676. As we have stated on several occasions, "the State, no less than a private owner of property, has power to

---

**33.** Although Budget presently has a contractual relationship with the Port Authority, that relationship ends with the expiration of the present contract or any extensions. With respect to the proposed new contract, Budget, as all rental car companies, stands in the position of being a bidder for a new contractual relationship with the Port Authority. In *Umbehr,* the Court em-

phasized the limited nature of its decision and said "[b]ecause Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." *Umbehr,* 518 U.S. at 686, 116 S.Ct. 2342.

preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 129–130, 101 S.Ct. 2676, *quoting Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), *in turn quoting Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

*Id.* at 46, 103 S.Ct. 948. More recently, the Court reiterated this basic distinction in *U.S. v. Kokinda,* 497 U.S. 720, 725–26, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990):

> The Government's ownership of property does not automatically open that property to the public. *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'n,* 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). It is a long-settled principle that governmental actions are subject to a lower level of First Amendment scrutiny when "the governmental function operating ... [is] not the power to regulate or license, as lawmaker, ... but, rather, as proprietor, to manage [its] internal operation[s]...." *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). That distinction was reflected in the plurality opinion in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), which upheld a ban on political advertisements in city transit vehicles ...

 \* \* \* \* \* \*

The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business, but its action is valid in these circumstances unless it is unreasonable, or, as was said in *Lehman,* "arbitrary, capricious, or invidious." *Ibid.*

▮ The above principles have been applied by the Supreme Court to an airport terminal operated by a public authority. In *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (*ISKON*), the Port Authority of New York and New Jersey which owned and operated airports in the greater New York area adopted a regulation forbidding within the terminals the repetitive solicitation of money or distribution of literature. A religious corporation engaging in such activity contended that this restriction violated its freedom of speech under the First Amendment. In determining the standard to be applied when a governmental unit is acting as a proprietor, managing its internal operations, the Court said:

> It is uncontested that the solicitation at issue in this case is a form of speech protected under the First Amendment. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Kokinda, supra,* 497 U.S. at 725, 110 S.Ct. 3115 (citing *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 629, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)); *Riley v. Nat'l Fed'n of Blind of N.C., Inc.,* 487 U.S. 781, 788–89, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). But it is also well settled that the government need not permit all forms of speech on property that it owns and controls. *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981); *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). *Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.* *Kokinda, supra,* 497 U.S. at 725, 110 S.Ct. 3115 (plurality opinion) (citing *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Thus, we have upheld a ban on political advertisements in city-operated transit vehicles, *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), even though the city permitted other types of advertising on those vehicles. Similarly, we have permitted a school district to limit access to an internal mail system used to communicate with teachers employed by the district. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

*Id.* at 677–78, 112 S.Ct. 2701 (emphasis added). The Court found that airports are not public fora and are not subject to a higher

burden of justifying speech restrictions than that of reasonableness.

The restrictions here challenged, therefore, need only satisfy a requirement of reasonableness. We reiterate what we stated in *Kokinda:* The restriction " 'need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation.' " 497 U.S. at 730, 110 S.Ct. 3115 (plurality opinion) (quoting *Cornelius, supra,* 473 U.S. at 808, 105 S.Ct. 3439). We have no doubt that under this standard the prohibition on solicitation passes muster. (emphasis that of the Court)

*Id.* at 683, 112 S.Ct. 2701. In considering the reasonableness of a governmental unit's restrictions on speech in a nonpublic forum, Justice O'Connor said:

"the reasonableness of the government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances," *quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 809, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

*Id.* at 687, 112 S.Ct. 2701 (concurring opinion).

■■■ It is evident that a standard of review based on reasonableness is fact-based and is dependent on all the circumstances surrounding the restriction and the reason for its imposition. This is illustrated by Justice O'Connor's concurring opinion in *ISKON* in which she found that the Port Authority's ban on solicitation was reasonable but the Port Authority's ban on distribution of written materials was unreasonable. *Id.* at 685–86, 112 S.Ct. 2701.

In the present case, there are, of course, facts which are distinguishable from the facts in *ISKON.* Here the Port Authority is restricting Budget's speech, not by a Board regulation as in *ISKON,* but by its insistence that Budget agree to the restriction as a part of an agreement to do business inside the airport terminal. *ISKON* involved restrictions on speech by a member of the public inside the airport terminal; the present case involves restrictions on speech by a concessionaire inside the airport terminal. Also, the Port Authority in the present case does not seek to ban all speech by Budget describing the additional charge to its customers but only to require that Budget's description of that charge be made without the use of certain prohibited words. While there are these and other dissimilarities in the factual patterns in *ISKON* and in the present case, the basic, fundamental unifying fact is that both cases involve a governmental unit, a Port Authority, which is seeking to impose speech restrictions on persons who are using airport property operated by the Port Authority in a proprietary capacity. In the Court's view, the manner in which the restrictions are imposed, the type of person on whom the restrictions are imposed, and the degree of that restriction, while relevant to the issue of reasonableness, do not serve to remove this case from the governing standard of reasonableness applied in *ISKON* and related Supreme Court decisions dealing with restrictions on speech by government entities on government-owned property.[34]

Somewhat surprisingly, the Port Authority contends that "the minimal First Amendment protection" given to persons on airport property by·the majority opinion in *ISKON* (505 U.S. at 695, 112 S.Ct. 2701, Kennedy, J., concurring) does not apply in this case. It is the Port Authority's belief that *ISKON* is not applicable because, "the public forum doctrine ... is only applicable when noncommercial speech is involved." (Port Authority's supplemental post-hearing brief, p. 2.) To support this contention, the Port Authority points to Justice Kennedy's concurring opinion in which he states that "the government cannot, of course, prohibit speech for the sole reason that it is concerned that the speech may be fraudulent." *Id., citing, Schaumburg v. Citizens for a Better Env.,* 444 U.S. 620, 637, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).[35]

**34.** In *Asian–American Cab Drivers .Welfare Ass'n v. Shoenberger,* 1992 WL 330046 (N.D.Ill. Nov.5, 1992), which dealt with an alleged infringement of First Amendment rights by a prohibition of certain commercial speech on airport premises, the court applied the reasonableness standard of *ISKON* without discussing *Central Hudson.*

**35.** *Schaumburg* struck down an ordinance that prohibited the solicitation of contributions by

The Port Authority contends that, "while [Justice Kennedy's] statement is true as to noncommercial speech, it is not with regard to commercial speech." Justice Kennedy's concurring opinion, however, is based on his belief that an airport is a public forum and therefore subject to the higher standards applicable to non-commercial or "pure" speech in a public forum. The important point is that the outcome in *ISKON* did not turn on the nature of the speech involved—it can be agreed that the speech was non-commercial or "pure" speech. The outcome turned on the fact that the restriction by the government agency dealt with the government agency's own property and the appropriate standard to be applied in that situation.

■ The Port Authority also refers to *American Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854 (3d Cir.1984), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985) (*American Future Systems*) and *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (*Fox*), cases involving commercial speech activity in the context of a public university's property, in which the courts applied the commercial speech standard of *Central Hudson* and not the government-owned property standard most recently applied in *ISKON*. Neither case, however, supports the Port Authority's position that the Central Hudson standard must be applied to speech activity on government-owned property if that speech is deemed to be commercial speech. In *American Future Systems*, the speech was found to be commercial, and the court described the problem of deciding which line of cases applies, *i.e.*, those dealing with government-owned property or those dealing with commercial speech:

> This conclusion [that the speech was commercial], however, forces us to confront an unusual situation: the intersection between government regulation of commercial speech and the regulation of

speech on government-owned property. Although the Supreme Court has set up a detailed analytic framework for determining the constitutionality of regulations in each of these situations, it has not, to our knowledge, been faced with the question of what test should be employed when both factors are present. If the two modes of analysis were equally applicable to the facts of this case, we would have to determine whether they yielded different results, and, if so, we would have to choose between them in determining the validity of Penn State's regulation.

*American Future Sys.*, 752 F.2d at 862.

The court noted that the property in question, university dormitory rooms, "do[es] not fit neatly into either the public forum or the non-public form mold," and concluded that "[o]ur best course of action, therefore, is to pursue the mode of analysis developed by the Supreme Court for cases involving commercial speech." *Id.* at 863.

The *Fox* decision also involved commercial speech in a state-owned university and, again, in dormitory rooms. The lawsuit was initially brought by a housewares company desiring to have access to dormitory rooms to sell its products and by students who desired to buy those products. On appeal from the district court, "the focus of the case shifted" because the housewares company dropped out as a party. *Fox v. Bd. of Trustees of the State Univ. of NY*, 841 F.2d 1207, 1208 (2d Cir.1988). As the Court of Appeals said:

> Since the case no longer involves the rights of third persons to gain access to state-owned property to give or receive speech, but rather the free speech rights of students who, as dormitory residents, have an undisputed right of access to their rooms as well as certain privacy rights, the public forum cases thought applicable by the district court are inapposite.

charitable organizations that do not use at least 75% of their receipts for charitable purposes. The Court distinguished the speech involved in *Schaumburg* from purely commercial speech. 444 U.S. at 632, 634, 100 S.Ct. 826. While the city had a legitimate interest in preventing fraud,

the Court held that the ban was overbroad in labeling such organizations as "fraudulent" and that the city's interest in preventing fraud could be better served by measures less intrusive than a direct prohibition on solicitation.

*Id.* at 1212. The Court of Appeals then proceeded to analyze the case under the *Central Hudson* four-part analysis.

In the Supreme Court, the state argued that, even if the speech was not commercial speech, the Court should uphold the state's action because the dormitories are not a public forum. The Court did not consider this question:

> Pursuing such an analysis would require us to resolve both legal and factual issues that the Court of Appeals did not address. Since we find that the Court of Appeals must be reversed on the basis of its own analysis, we decline to go further.

*Bd. of Trustees of the State Univ. of N.Y. v. Fox,* 492 U.S. 469, 473 n. 2, 109 S.Ct. 3028, 106 L.Ed.2d 388.

In short, this Court does not believe that the cases cited by the Port Authority support the proposition that if the speech on a government-owned airport is deemed to be "pure speech," the reasonableness standard of *ISKON* applies, but if found to be commercial speech, the higher standard of *Central Hudson's* four-part analysis must be applied. In the view of this Court, the Supreme Court's recognition of the right of a governmental entity, "no less than a private owner of property," to preserve the property under its control for the use to which it is lawfully dedicated, is the polestar for locating the proper test or standard to determine the constitutionality of speech restrictions imposed by the government owner on persons desiring access to the owner's property. Whether the speech in question is deemed to be "pure" or "commercial," while certainly a relevant factor in assessing all of the circumstances to determine the reasonableness of the restriction, the distinction should not require the imposition of two different standards on the owner of the property. If, as found by the Supreme Court, the reasonableness standard is adequate to protect the First Amendment rights of persons who are engaged in "pure" or noncommercial speech on the airport property, it surely is adequate to protect First Amendment rights of persons who are engaged in commercial speech on the airport property, speech which has been determined to have "a subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), *rehearing denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

Budget's position is that "*ISKON* stands for the proposition that speech, at an airport, is protected by the First Amendment of the United States Constitution," but Budget "questions whether this case applies at all to the facts before the Court." (Budget's supplemental post-hearing brief, p. 1.) Budget distinguishes *ISKON* because it involved a total ban on certain speech at the airport whereas the present case does not involve a total ban on Budget's speech at the airport. That difference, however, simply reflects a variation in the extent of the questioned restriction on speech, and while the scope of the restriction is an important factor in the application of the reasonableness standard, as discussed *infra,* it does not serve to prevent the *ISKON* standard from being applied in this case.

## 2. Application of *ISKON's* Standard of Reasonableness to the Facts of this Case

Two important facts are uncontested. First, the "access fee" Budget charges its customers is not a fee imposed by the Port Authority on car rental customers. Second, the proposed Concession Agreement, as previous concession agreements, requires the car rental companies to pay the Port Authority compensation for a counter inside the airport terminal and the benefits attendant with doing business at that location. Although denominated a "privilege fee," the compensation required to be paid, in the Court's view, is the equivalent of rental payments for space inside the terminal.[36] Regardless of nomenclature, however, the "privilege fee" is an integral part of Budget's cost

---

36. Ms. Warner–Dooley referred to the Port Authority in this context as a "landlord" (Tr. Vol. III p. 144), the concession contracts being "similar to leases" (Tr. Vol. III p. 162) or "rental agreements." (Tr. Vol. III p. 163.) Mr. Sturtz, counsel for Budget, also referred to the previous concession agreements as "the old leases." (Tr. Vol. II p. 6.)

of doing business. Budget, for competitive advantages, has carved out this portion of its overhead costs and is passing it on to its customers in the form of an "access fee." (Port Authority's Exhibit 15.)

This practice, employed by some car rental companies, of carving out or "unbundling" this portion of their overhead and adding it to the companies' advertised rates when the customer receives the total charges for the car rental, has not been universally approved.[37] An Illinois statute, for example, requires that all car rental charges, including airport surcharges, must be bundled into the advertised rental charges, a requirement that has withstood constitutional challenge, including a claim of First Amendment violation. *Alamo Rent A Car, Inc. v. Ryan,* 268 Ill.App.3d 268, 205 Ill.Dec. 738, 643 N.E.2d 1345 (1994). In that case, Alamo claimed that this requirement unconstitutionally regulated Alamo's commercial speech. In applying the first inquiry of the *Central Hudson* standard,[38] *i.e.* whether the speech in question is misleading, the Illinois court said:

> Alamo's claim does not make it past the first inquiry. The speech affected by the bundling requirement of subsection (f) is misleading and therefore not protected speech. The advertising does not apprise the public of the actual cost of renting a car. Rather, it misleads the public into thinking that the advertised rate, the base rental rate, is the actual cost of the car rental. However, when the customer comes to the rental counter they are charged a significantly higher rate due to additional charges. The State has an interest in protecting the public from misleading advertising which hampers the public's ability to make an informed decision on the selection of a rental car. Therefore, a prohibition on this misleading advertising i[s] not unconstitutional and Alamo's challenge to subsection (f) on first amendment grounds must fail.

*Id.,* 205 Ill.Dec. 738, 643 N.E.2d at 1352.

■■■ In the present case, the Port Authority "does not support the practice of transferring Concessionaire's obligation for payment of the Privilege Fee due herein to its customers" (Joint exhibit 8, § 4.6.1), but it is not seeking to prevent that practice.[39] Instead, the contract requirement prohibiting the use of certain words describing this charge is "to insure that the unbundled fee is not described in a manner that further misleads consumers." (Port Authority's post-hearing memorandum, p. 46.) It is the Port Authority's position that the description used by Budget is actually false because such a

---

37. See, *e.g.,* the Automobile Rental Concession Agreement between the Kenton County Airport Board, which operates the Cincinnati/Northern Kentucky International Airport, and Freedom River, Inc., d.b.a. Budget Rent a Car, which provides that "Concessionaire shall not list concession fees payable to the Airport as a separate item on its customer's rental contracts or invoices." (Port Authority's exhibit 25, ¶ 1.13E of Agreement.)

38. The court apparently did not consider applying the *ISKON* standard of reasonableness.

39. The affidavit of Robert L. Aprati, General Counsel for Budget Rent a Car Corporation (Budget's exhibit P), deals primarily with a non-issue in this case. Mr. Aprati argues in his affidavit against any requirement that the airport concession fee be included in the advertised rate and not separately charged to the customers. While section 4.6.1 of the proposed agreement with Budget originally prohibited the privilege fee from being charged as a separate amount, this is no longer the case. Addendum Number 3 recognizes this practice and restricts how this additional charge can be described. Mr. Aprati's affidavit also contains his opinions regarding the First Amendment and the effect of excerpted quotations from an unnamed person in the Office of the Secretary of the Federal Trade Commission and certain state officials, as well as excerpts from concession agreements in some other airport facilities. His opinions regarding the legality or wisdom of permitting the "unbundling" of concession fees, in addition to being irrelevant, are not the proper subjects of an affidavit. As the Sixth Circuit has said, an "affidavit is no place for ultimate facts and conclusions of law." *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.,* 650 F.2d 118, 121 (6th Cir.1981), *citing* 6 Moore's Federal Practice, Part 2, § 56.21(1) at 56–1316 (Supp.1979). Further, the Court notes, in passing, the following statement of Mr. Aprati:

> "5. That notwithstanding a diligent search, my office has been unable to locate any specific case law concluding that practices similar to the current industry practice of separately stating and charging an airport concession fee are deceptive, misleading or unfair."

Mr. Aprati, who executed the affidavit in Illinois, does not refer to the above decision of the Illinois Court of Appeals in *Alamo Rent A Car v. Ryan.*

description implies that the surcharge is imposed on the car rental transaction by the Port Authority. (Port Authority's post-hearing memorandum, p. 43.)

This Court does not believe that the words "access fee" can be found to be actually false or inherently misleading. They do describe—in extremely abbreviated form—the surcharge as a cost of using the airport facilities or having access to those facilities. While this may not be an utterly false or inherently misleading characterization of the surcharge, it clearly is a potentially misleading characterization. It does not in any way identify this surcharge as being a recoupment by Budget of a part of its overhead costs of doing business at the airport and not a charge imposed directly on the airport customer by the Port Authority. It appears in close proximity to the listing of governmental taxes on the car rental agreements, and a customer could well be misled into believing that this additional charge is one imposed by the Port Authority or some other governmental entity.[40]

There can be no doubt that the Port Authority has a legitimate interest in assuring that travelers and others using the airport facilities are not deceived or misled by car rental companies and other concessionaires that do business with those persons. Budget does not contend otherwise. While it contends that its characterization of the surcharge is not misleading, Budget also argues that the prohibition against the use of the list of words contained in section 4.6.1 would prohibit Budget from using any of these words, even if used in an accurate explanation of the abbreviated description. (Budget's post-hearing brief, pp. 32–33.) With regard to the latter argument, Budget is correct.

Although the proposed agreement would prohibit Budget from using any of the listed words in any description of any surcharge Budget imposes on its customers, Ms. Warner–Dooley, who drafted the proposed agreement, did not intend that the prohibition be that extensive. As she testified:

> What I am trying to say is these words can be used in a description, whether it appears on the front or the back, but I don't want these words used in the actual surcharge itself because it's difficult to make the description without using these words, I understand, but giving the special emphasis they will give as part of the short fee surcharge, is what the customer is looking at when they're going through the charges. I want these words, if nothing else, reserved for any description. Let's get something less implicating the airport as to surcharge.

(Tr. Vol. III pp. 198–99.) The problem is that section 4.6.1 is so sweeping in its prohibition that, the drafter's intention notwithstanding, it would, by its express terms, prohibit Budget from using any of the listed words, even if used in an accurate and non-misleading description of the surcharge.

If section 4.6.1 of the proposed agreement had stopped with the restriction that "Concessionaire is prohibited from stating or implying, in writing or verbally, that the Airport or Authority imposes or approves of any such direct charge to a customer," the Court would have no difficulty in finding that the restriction does not infringe on plaintiff's First Amendment rights. The undisputed facts are that the Authority does not impose this charge as a direct charge to a customer (as it does with the $3.00 passenger facility charge imposed on each airline ticket, *see,* Tr. Vol. III pp. 76, 185–86) and that, while defendant is not currently prohibiting the charge from being made by Budget, it has

---

40. When questioned by the Court regarding the Port Authority's effort to prevent customers from believing that the surcharge is imposed on the customer by the Port Authority, Thrifty's owner testified:

THE COURT: But do you feel that [the Port Authority's effort] would prevent you from telling the customer that this is an amount that Thrifty pays the airport for its concession, and we are passing that on to the consumer?

THE WITNESS: I guess my feeling is that the airport is getting the revenue, and I'm not sure what the—their concern is about having the customer know that we're collecting this revenue *on behalf of them.* (emphasis added) (Tr. Vol. II p. 114.) This, of course, is an illustration of the problem. The surcharge is not collected on behalf of the Port Authority. It is collected on behalf of the car rental company.

not approved of this charge being assessed by Budget against a customer. Therefore, defendant clearly has the right to prevent Budget from stating or implying, in writing or verbally, something that simply is not true. Such a restriction, in short, is clearly a reasonable restriction on Budget's speech, and Budget would have no legitimate basis for complaint. Budget does have, however, a legitimate basis for complaint that section 4.6.1 in its present form is unreasonable due to the sweeping prohibition against using any of the listed words, or any form thereof. Literally enforced, Budget could not describe the surcharge as "Budget's cost of doing business at the airport" which, as an example, would be an accurate and non-misleading description of the surcharge.[41]

The proposed agreement specifically authorizes, with respect to any recoupment of rent paid by Budget for the use of the new garage, a description of Budget's charge to its customer as a "Garage Recoupment Surcharge" under the following conditions:

1. Such surcharge is titled "Garage Recoupment Surcharge";

2. There is no reference to the Airport or the Authority and there is no statement or inference in writing or orally that the fee is imposed by the Airport or the Authority;

3. Such surcharge shall be immediately adjacent to Concessionaire's time and mileage charge on the customer's invoice;

4. If the Concessionaire elects to charge a Garage Recoupment Surcharge, Concessionaire complies with FTC requirements with respect to this charge and notifies the customer of the surcharge

at the time of reservation and again at the time of execution of the contract; and

5. The amount of the surcharge per rental car transaction does not exceed the applicable Annual Garage Recoupment as described [in section 4.6.3].

(Joint Exhibit 8, § 4.6.2.) Budget's amended complaint does not challenge the Port Authority's right to require that this expense—if passed on to the customer—be described by the specific language set forth in the contract and that the surcharge be conditioned upon meeting the enumerated requirements set forth in section 4.6.2 of the contract.[42] Budget makes no claim that these restrictions regarding garage rental expenses are any infringement on its First Amendment rights, nor has any argument or evidence been presented that would support a finding that the provisions of 4.6.2 are more extensive than necessary to serve the legitimate governmental interest of preventing car rental customers from being misled as to the true nature of the particular expense of Budget being passed on to its customers in the form of a surcharge.

In the opinion of this Court, the Port Authority could require similar language with respect to Budget's surcharge for the cost of its concession inside the terminal by simply changing the description of "Garage Recoupment Surcharge" to "Concession Recoupment Surcharge."[43] The description would not be misleading or potentially misleading—any more than the garage recoupment surcharge—because it describes, in abbreviated form, a charge for the concession cost paid by Budget that is being recouped from its customers by Budget.[44]

---

**41.** As Budget's general manager appropriately said, "We can't even call it what it is, the cost of doing business." (Tr. Vol. II p. 51.)

**42.** The amended complaint seeks a declaratory judgment and injunctive relief only with respect to sections 4.5, 4.6.1 and 18.1 of the proposed agreement. As noted earlier, Budget's objection regarding section 4.5 *No Diversion,* was settled by the parties. (Footnote 19, *supra.*) Section 18.1 gives the Port Authority the right to obtain specific performance of all obligations of the concessionaire which, Budget asserts, gives the Port Authority the "ability to obtain injunctions to regulate the content of the communications

between [Budget] and its customers." (Amended Complaint ¶ 29.)

**43.** Budget agreed that it could "live" with this description. (Tr. Vol.I. p. 27.) The Port Authority, however, apparently does not want the word "concession" used, although its objection seems to be based more on where the word appears on the invoice than on the word itself. (Tr. Vol. I p. 36–37.)

**44.** The Court does not mean to suggest that this is the most appropriate language that could be used. There are undoubtedly other combina-

·According to Ms. Warner–Dooley, she drafted the prohibition against the use of the listed words, rather than draft a required description, as she did with the "Garage Recoupment Surcharge," because she did not want to extend any alleged antitrust protection to the car rental companies with reference to their privilege fee surcharge. (Tr. Vol. III pp. 211–216.)[45] The Court believes that it is within the power of the Port Authority to require that concessionaires that impose a surcharge on persons using the airport facilities describe that surcharge in language that would prevent airport patrons from being misled regarding the origin and nature of the surcharge. It may do so by specifying the language to be used—as the Port Authority has done with respect to the Garage Recoupment Surcharge—or it may leave it to the concessionaires to formulate their individual descriptions, which, incidentally, could well result in a variety of descriptions used by different car rental companies. While the former method would be a restriction on commercial speech, so long as the required language would be truthful and not misleading and would further a legitimate interest of the Port Authority, it would be a restriction that would be a reasonable restriction under the *ISKON* standard and would not violate plaintiff's First Amendment right to freedom of commercial·speech. If the Port Authority chooses the latter method—as it has done in the proposed agreement—it may not restrict the language chosen by the car rental companies to a degree that it prevents the companies from describing the surcharge in a truthful and not misleading manner. By permitting the car rental companies to devise their own descriptions but imposing excessively broad prohibitions on the words that can be used, the Port Authority has infringed upon Budget's right to freedom of commercial speech.

Although Budget does not complain about the requirement that the Garage Recoupment Surcharge be "immediately adjacent to Concessionaire's time and mileage charge on the customer's invoice" (Joint exhibit 8, § 4.6.2), it does complain about the requirement that any surcharge based on its concession charge "must appear adjacent to time and mileage charges." (Joint exhibit 8, § 4.6.1.) The Court finds no merit in this complaint.

Budget contends that this requirement could cause customer confusion because car rental customers are accustomed to seeing such charges at the bottom of the invoice and not at the top next to the time and mileage charge. Budget's General Manager testified:

> So if the customer was to question us and say, what is this? Why is this up here? Because they are conditioned to know sales tax is always on the bottom. They know what sales tax is. Airport fees have always been on the bottom. People know what that is.

(Tr. Vol. II pp. 47–48.) Thrifty's owner testified:

> QUESTION: Where is it traditionally shown, an airport surcharge, on the contracts that the customer is used to seeing?
>
> ANSWER: Down where the tax is at the bottom of the contract, subtotals and then charges, sales tax and airport access fees.

(Tr. Vol. II pp. 108–09.) It is precisely because of its proximity to governmental taxes that the Port Authority wants the surcharge relocated on the invoice to lessen the potential of confusion of this charge made by Budget with charges made by governmental units, including the Port Authority.

The requirement, in short, is a reasonable effort by the Port Authority to prevent the car rental customer from assuming that the

---

tions of words that would describe the surcharge in an accurate and non-misleading manner. The problem with the extremely broad prohibition in its present form is that it unreasonably restricts Budget from the use of words which could, and perhaps should, be used to fairly describe the surcharge.

**45.** This Court is concerned only with the First Amendment issues raised by the prohibition;

there are no antitrust issues involved in this case, and the Court expresses no opinion as to whether the conduct of the car rental companies does or does not violate any antitrust laws or whether the authorization by the Port Authority to impose such charges does or does not provide some protection against a contention that there is a violation of the antitrust laws.

surcharge, presently appearing in close proximity to governmental taxes, is, like those taxes, an additional charge being imposed directly on the customer by the Port Authority or some other governmental agency.[46]

### 3. Application of *Central Hudson's* Four–Part Standard to the Facts of this Case

■ This case presents, as the Third Circuit described its case in *American Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 858 (3d Cir.1984), "an unusual situation: the intersection between government regulation of commercial speech and the regulation of speech on government-owned property." For the reasons previously stated, it is this Court's opinion that the proper standard to be applied in such situations is the reasonableness standard applied to the government-owned airport property in *ISKON*. The parties to this case, however, have presented their arguments in support of their respective positions in the context of the Supreme Court's decision in *Central Hudson*.

Budget contends that the Port Authority's restrictions fail to meet the *Central Hudson* criteria for constitutional restrictions on commercial speech, primarily because the term "access fee" is not misleading and there is no legitimate public interest in preventing Budget from using the prohibited words in an accurate and non-misleading manner. (Budget memorandum in support of motion for preliminary injunction, pp. 30–31.) The Port Authority contends that the term "access fee" is inherently misleading and entitled to no First Amendment protection, but if only potentially misleading, *Central Hudson* must be applied. The Port Authority insists that the restrictions meet all the criteria under

the *Central Hudson* standard. (Port Authority's pre-hearing memorandum, pp. 26–31.)

In the Court's view, even if the First Amendment standard applicable in this case is the *Central Hudson* standard, rather than the *ISKON* standard, the result would be the same.

In *Central Hudson*, as noted earlier, the Supreme Court set forth a four step analysis to be made when considering restrictions on commercial speech:

1. The speech must concern lawful activity and not be misleading, and

2. The asserted governmental interest must be substantial.

If the answer to these two inquiries is positive, then it must be shown that:

1. The restrictions directly advance the governmental interest asserted, and

2. The restrictions are not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. 2343.

Budget's speech obviously concerns lawful activity, and as previously stated, the Court does not believe that the words "access fee" can be found to be false or inherently misleading and not entitled to First Amendment protection. This description of Budget's surcharge, however, is potentially misleading for the reasons previously given. The Supreme Court has indicated that, in cases subject to the *Central Hudson* criteria, the government cannot place an absolute prohibition on speech that is only potentially misleading if the information can be presented in a way that is not deceptive, *i.e.*, by restrictions that

---

**46.** The Court is aware that Budget's current form for computer generated invoices has limited space for a description of its charges. Cryptic abbreviations, even if accompanied by a fine print explanation elsewhere on the form, may not fairly inform the customer of the surcharge in question in a way that it is accurate and not misleading. The forms may have to be revised to more fully set forth the nature of the surcharge, but if, as Budget says, "Budget would like to accurately and completely disclose to its customers the charges, fees, and taxes associated with renting one of their vehicles" (Budget's memorandum in support of motion for preliminary

injunction, pp. 29–30), Budget should be willing, if not anxious, to revise its forms.

Budget has expressed concern that the language the Port Authority proposes to prohibit in describing the surcharge conflicts with the language used by Budget's licensor in its national advertising. (Tr. Vol.1, pp. 20–24.) In the Court's view, the Port Authority's right to require that the surcharge be stated in a manner that is not misleading or potentially misleading is not affected by the manner in which the licensor describes the surcharge in its national advertising.

are no broader than reasonably necessary to prevent the deception, *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). The Port Authority is not placing an absolute prohibition on Budget describing its surcharge on its invoices. Instead, the Port Authority is imposing restrictions on how Budget's description of its surcharge can be made in a way that is not potentially misleading.

The Port Authority's asserted governmental interest—the prevention of misleading or potentially misleading information being given by the airport concessionaires to persons using the Port Authority's terminal—is a substantial governmental interest, and the restrictions are intended to directly advance that interest. The problem is that the prohibition against the use of words which could be used to present the information about the surcharge in an accurate and non-misleading manner are broader than necessary to prevent the description from being potentially misleading, *In Re R.M.J.*, or in the words of *Central Hudson*, more extensive than is necessary to serve the asserted governmental interest.

Accordingly, whether the restrictions are reviewed under the *ISKON* standard or the *Central Hudson* standard, the outcome is the same—the restrictions imposed on Budget's speech by section 4.6.1 of the proposed agreement in its present form violate Budget's right to commercial speech under the First Amendment to the United States Constitution.

This Court concludes that Budget cannot be required to relinquish its First Amendment right to commercial speech as a condition of obtaining the Concession Agreement for 1998–2008; that the Port Authority, however, may impose reasonable restrictions on that right as the proprietor of government property used by Budget; but that the restrictions in their present form contained in section 4.6.1 are excessively broad and unreasonable and are, therefore, violative of Budget's First Amendment right and are, consequently, unenforceable.

## V. *Conclusion*

Plaintiff's motion to enjoin defendant from including in plaintiff's gross revenue any income from non-airport related car rentals at its Stelzer Road location, as required by the proposed 1998–2008 Concession Agreement, is **DENIED.**

Plaintiff's motion to enjoin defendant from the enforcement of section 4.6.1 of the proposed 1998–2008 Concession Agreement, insofar as that section in its present form prevents plaintiff from using any of the specified prohibited words or any form thereof, *i.e.*, airport, authority, government, Port Columbus, concession, access, passage, cost of doing business, fee, toll, assessment, or tax, to describe plaintiff's surcharge to its customers for its cost of the privilege fee required to be paid by plaintiff to the defendant under the Concession Agreement, is **GRANTED.** As long as section 4.6.1 remains in its present form as an acknowledgment that plaintiff may formulate its own description of the concession fee surcharge, defendant cannot prohibit the use of words which could be incorporated in a description of the surcharge in a truthful and non-misleading manner. The defendant is not enjoined from restricting the use of the words "access fee" or other potentially misleading words standing alone on the front of plaintiff's invoice, but is enjoined from prohibiting the use of these words or the other listed words in descriptions of the concession fee surcharge that are truthful and not potentially misleading.

Insofar as plaintiff's motion seeks to enjoin defendant from imposing any restriction on the language used by plaintiff to describe this surcharge, the motion is **DENIED.** Defendant has the right to require that plaintiff truthfully inform plaintiff's customers, on whom plaintiff imposes the surcharge, that it is a surcharge imposed by Budget and not by defendant or any other governmental entity, and defendant may require plaintiff to so inform its customers both verbally and on plaintiff's invoices and rental agreements in any reasonable manner, including, but not limited to, requiring that the surcharge be described in language mandated by the defendant that is both truthful and formulated

to prevent any description of the surcharge from being potentially misleading.

**IT IS SO ORDERED.**